IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THE UNITED STATES OF AMERICA; and COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiffs, <br><br> v. <br><br> STATE OF ILLINOIS; JB PRITZKER, the Governor of Illinois in his official capacity; KWAME RAOUL, in his official capacity as Attorney General of Illinois; DIONNE R. HAYDEN, in her official capacity as Chairperson of the Illinois Gaming Board; SEAN BRANNON, in his official capacity as Member of the Illinois Gaming Board; STEPHEN R. FERRARA, in his official capacity as Member of the Illinois Gaming Board; CALEB J. MELAMED, in his official capacity as Member of the Illinois Gaming Board; and MARCUS D. FRUCHTER, in his official capacity as Administrator of the Illinois Gaming Board, <br><br> Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br><br> Case No.: 26-cv-3659 |

Plaintiffs, the United States of America and the Commodity Futures Trading Commission

("CFTC" or "Commission"), by and through their undersigned counsel, bring this civil action for

declaratory and injunctive relief, and allege as follows:

## I.   INTRODUCTION

1.      The Commodity Exchange Act ("CEA" or the "Act"), 7 U.S.C. §1, *et seq.*, provides

a comprehensive regulatory framework for the regulation of derivatives transactions in the United

States.  This federal law designates the CFTC as the federal agency with "exclusive jurisdiction"

over the regulation of futures, options, and swaps traded on federally regulated exchanges.

7 U.S.C. § 2(a)(1)(A).  Plaintiffs bring this action in response to Defendants' sending of cease and

desist letters to various CFTC-regulated entities in which Defendants assert that Illinois law permits Defendants to regulate markets over which Congress has granted "exclusive jurisdiction" to regulate to the CFTC.

2.     Defendants seek to prohibit CFTC-regulated "Designated Contract Markets" ("DCMs") from operating in Illinois and offering Illinois customers access to event contracts—a type of derivative instrument regulated by federal law that, absent certain narrow exceptions, can be traded only on CFTC-regulated exchanges in transactions facilitated by CFTC-regulated intermediaries.

3.     Illinois's attempt to shut down federally regulated DCMs intrudes on the exclusive federal scheme Congress designed to oversee national swaps markets.  Prompted by the evolution of national financial markets and repeated conflicts with state law, Congress enacted the CEA, granting the CFTC exclusive jurisdiction to regulate those markets and enacting a comprehensive federal regulatory framework that preempts state laws that attempt to regulate the operation of, or transactions on, CFTC-regulated exchanges.  This comprehensive federal regulatory scheme preempts Illinois law as applied to event contracts traded on federally regulated exchanges.

4.     Event contracts are derivative instruments that enable parties to trade on their predictions about whether a future event—which may relate to economics, or elections, or climate, or sports, or anything else of potential financial, economic, or commercial consequence—will occur.  When structured as "swaps" or futures contracts as defined by the CEA, and traded on CFTC-regulated exchanges, they are subject to the exclusive jurisdiction of the CFTC.

5.     As of the date of filing of this complaint, at least eight CFTC-regulated DCMs have collectively self-certified with the CFTC more than 3,000 event contracts pursuant to CFTC Rule 17 C.F.R. § 40.2.

2

6. As of the date of filing of this complaint, the Illinois Gaming Board has issued cease and desist letters to three CFTC-regulated DCMs on the grounds that these companies are engaged in unlawful "sports wagering" or "gambling" under the Illinois Sports Wagering Act, Criminal Code, and Administrative Code by listing and facilitating the trading in event contracts. These letters state that under Illinois law "[i]t is unlawful to knowingly establish, maintain, or operate an Internet site that permits a person to play a game of chance or skill for money or other thing of value, or that permits a person to make a wager upon the result of any sport, game, contest, political nomination, appointment, or election via the Internet without an IGB-issued license."

7. Defendants have made clear that they believe event contracts, including sports-related event contracts listed on CFTC-regulated DCMs, are wagers, rather than swaps, and so may be offered only by firms that have obtained a license from the Illinois Gaming Board. The Illinois Gaming Board has threatened CFTC-regulated DCMs with civil or criminal penalties for offering sports or political event contracts in Illinois or to Illinois residents without an Illinois license.

8. Defendants misapprehend both the nature of these contracts and the federal regulatory framework. Event contracts, including sports-related event contracts that are listed on DCMs, are covered by the CEA, and the CEA prohibits States from invading the CFTC's exclusive jurisdiction over event contract transactions offered by and executed on federally regulated DCMs. By prohibiting these DCMs from operating in Illinois without an Illinois license or by conditioning their operation on compliance with Illinois laws and regulations, Defendants directly interfere with Plaintiffs' authority pursuant to the federal scheme imposed by Congress through the CEA.

9. Because Defendants' actions asserting regulatory authority over DCMs directly conflict with the CEA and rules promulgated by the CFTC under the CEA, those actions are

3

preempted. This Court should put an end to the ongoing efforts by Defendants to undermine the uniform application of federal law by declaring that the Illinois Sports Wagering Act, 230 Ill. Comp. Stat. 45, the Illinois Criminal Code, 720 Ill. Comp. Stat. 5/28-1(a), and the Illinois Administrative Code, Ill. Admin. Code tit. 11, § 1900.1210(a) are preempted by federal law as applied to event contract swaps listed for trading on CFTC-regulated DCMs and are thus unlawful.

10. Unless restrained and enjoined by the Court, Defendants are likely to continue their attempts to subvert federal law and the exclusive jurisdiction to regulate event contract swaps conferred on the CFTC by Congress. Plaintiffs request that this Court enjoin the enforcement of these laws as applied to commodity derivatives markets and swaps traded on DCMs.

## II. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). This action presents a federal question under the laws and Constitution of the United States because it concerns whether the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*, preempts Illinois's gambling laws insofar as they purport to regulate transactions on a CFTC-regulated DCM.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because at least one defendant resides in this district and all defendants are residents of the State.

13. The Court has the authority to provide the relief requested under the Supremacy Clause, U.S. Const. art. VI, cl. 2, as well as 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

### III.  PARTIES

14.     Plaintiff the United States of America regulates U.S. financial markets, and it enforces federal commodity derivatives laws through its agency, the CFTC.

15.     Plaintiff the CFTC is an agency of the United States Government that regulates U.S. financial markets, and it enforces federal commodity derivatives laws through its Executive Agency the Commodity Futures Trading Commission.  The CEA grants the CFTC authority to represent itself through its General Counsel.  7 U.S.C. § 2(a)(4).

16.     Defendant State of Illinois is a state of the United States.

17.     Defendant JB Pritzker is the Governor of Illinois and is sued in his official capacity. Under the Illinois Constitution, the Governor of Illinois has "the supreme executive power, and shall be responsible for the faithful execution of the laws." Ill. Const. art. V, § 8.

18.     Defendant Kwame Raoul is the Attorney General for the State of Illinois and is sued in his official capacity.  The Attorney General of Illinois is the state's chief legal officer. The Office of the Attorney General has locations within the Northern District of Illinois, including in Chicago, IL.

19.     Defendant Illinois Gaming Board ("IGB") is the Illinois state regulatory and law enforcement agency that regulates casino gambling, video gaming, and sports wagering in Illinois. The agency has five Board Members appointed by the Governor and confirmed by the Senate.  It has its headquarters offices in Chicago and Springfield.

20.     Dionne R. Hayden is sued in her official capacity as the Chairperson of the Illinois Gaming Board.

21.     Sean Brannon, Stephen R. Ferrara, Caleb J. Melamed, and Marcus Fruchter are named as Defendants in their official capacities as Members of the Illinois Gaming Board.

#### IV.   OTHER RELVANT ENTITIES OR AGENCIES

22.    KalshiEx LLC ("Kalshi") is a CFTC Designated Contract Market.  Kalshi obtained CFTC designation as a Contract Market on November 3, 2020.  Kalshi does business in the United States using the name "Kalshi" and offers products and transactions including event contract swaps through its website, www.Kalshi.com.

23.    North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America ("NADEX" or "Crypto.com") is a CFTC Designated Contract Market.  NADEX obtained CFTC designation as a Contract Market in 2004.  NADEX was acquired by Foris DAX Markets, Inc. in March 2022 and now does business under the names NADEX and Crypto.com.  NADEX offers products and transactions including event contract swaps through its websites, nadex.com and crypto.com.

24.    QCX LLC is a CFTC Designated Contract Market and does business in the United States under the name Polymarket US ("Polymarket").  Polymarket obtained CFTC designation as a Contract Market on July 9, 2025.  Polymarket offers products and transactions including event contract swaps through its website, polymarket.com.

25.    Robinhood Derivatives LLC ("Robinhood") is a CFTC-registered Futures Commission Merchant ("FCM"). Robinhood obtained CFTC designation as an FCM on November 23, 2010. Robinhood offers event contract swaps in partnership with DCMs.

#### V.   FEDERAL LAW GOVERNING COMMODITY DERIVATIVES MARKETS

##### A. Congress Vested the CFTC with Exclusive Regulatory Authority Over U.S. Commodity Derivatives Markets

26.    The Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3.  The Constitution also vests the President of the United States with the "executive Power," U.S. Const.

art. II, § 1, and authorizes the President to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

27. Based on its enumerated constitutional and sovereign powers to regulate interstate commerce, the United States has broad authority to regulate futures and derivatives markets. That authority includes the power to enforce the supremacy of federal law regulating futures and derivatives markets.

28. The United States has well-established, comprehensive, and preemptive authority to regulate U.S. financial markets. The CEA is the federal statute that provides a comprehensive federal framework for the regulation of commodity derivatives transactions in the United States.

29. The CFTC is the federal executive agency charged with administering and enforcing the CEA. Congress created the CFTC in 1974 to establish a uniform national system for regulating futures trading after concluding that the then-existing patchwork of state-by-state regulation had impaired the development and functioning of national commodity derivatives markets. *See* H.R. Rep. No. 93-975, at 51 (1974); S. Rep. No. 93-1131, at 36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5885.

30. Derivatives are financial instruments such as futures, options or swaps that derive their value from something else, like a benchmark or a physical commodity. In general, market participants use derivatives to hedge risks or speculate on commodity price movements.

31. The CEA requires that, subject to certain exemptions or exceptions, commodity derivative transactions must be conducted on exchanges designated by, or registered with, the CFTC. For example, trading of commodity futures contracts must be conducted on a board of trade designated by the CFTC as a contract market or a registered foreign board of trade (*see* 7 U.S.C. § 6 and 17 C.F.R. § 48.3); no person may operate a facility for the trading or processing

of swaps unless the facility is registered as a swap execution facility or designated as a contract market (*see* 7 U.S.C. § 7b-3(a) and 17 C.F.R. § 37.3); commodity options must likewise be conducted on a board of trade designated as a contract market (*see* 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2).

32.     The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the Act] and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  7 U.S.C. § 5(b).

33.     Designated Contract Markets are boards of trade or exchanges that operate under the regulatory oversight of the CFTC pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  The CFTC designates a board of trade as a contract market through a formal application process through which an applicant board of trade must demonstrate its ability to comply with detailed statutory requirements called "core principles."  7 U.S.C. § 7(d).  These core principles require, among other things, that DCMs:

a.  Establish, monitor, and enforce compliance with the rules of the market including (i) access requirements, (ii) the terms and conditions of any contracts to be treaded, and (ii) rules prohibiting abusive trade practices;

b.  Have the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the market;

c.  List only contracts that are not readily susceptible to manipulation;

d.  Have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process

through market surveillance, compliance, and enforcement practices and procedures, including (i) methods for conducting real-time monitoring of trading and (ii) comprehensive and accurate trade reconstructions;

e. Provide a competitive, open and efficient market and mechanism for executing transactions that protects the price discovery process;

f. Maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information (i) to assist in the prevention of customer and market abuses and (ii) to provide evidence of any violations of the rules of the contract market;

g. Establish and enforce rules and procedures for ensuring the financial integrity of transactions and the protection of customer funds; and

h. Establish and enforce rules (i) to protect markets and market participants from abusive practices committed by any party and (ii) to promote fair and equitable trading on the contract market.

34. The CFTC has enacted detailed rules governing the process through which a board of trade can achieve designation as a contract market, and detailed rules governing the operations of the contract market once that designation is in place. 17 C.F.R. § 38, *et seq.* DCMs may list for trading commodity futures, options, or swaps as permitted by Part 38 of the CFTC's regulations, 17 C.F.R. § 38, *et seq.*

35. Event contracts listed on CFTC-regulated DCMs are a type of "swap" as defined by the CEA. Section 1a(47) of the CEA, 7 U.S.C. § 1a(47), broadly defines "swap" to include "any agreement, contract, or transaction"—

(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence; . . .

9

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap . . . [or,]

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of [these clauses].

36.     The CEA and CFTC Regulations establish important protections for derivatives markets, market participants, and the general public by creating uniform regulations of a nationwide—and often international—market.  For example, DCMs must conform to core principles that are designed to achieve the prevention of market abuse (7 U.S.C. § 7(d)(12)(A)); ensure their financial stability (7 U.S.C. § 7(d)(21)); protect their information security (17 C.F.R. § 38.1051(a)(2)); and safeguard their systems in the event of a disaster (17 C.F.R. § 38.1051(a)(3)). Further, DCMs must ensure that the contracts that they list for trading are "not readily susceptible to manipulation" (7 U.S.C. § 7(d)(3)); DCMs must "prevent market disruption" (7 U.S.C. § 7(d)(4)); DCMs must impose position limits designed to reduce the potential threat of market manipulation or congestion (7 U.S.C. § 7(d)(5)); DCMs must establish and enforce rules to minimize conflicts of interest (7 U.S.C. § 7(d)(16)); DCMs must provide impartial access to traders (17 C.F.R. § 38.151); and DCMs must maintain and retain important records and provide them to the Commission (7 U.S.C. § 7(d)(18)).  And the CEA conferred on the CEA enforcement authority to "bring an action in . . . [a] district court . . . to enjoin . . . or enforce compliance with [the CEA]" if "it shall appear to the Commission" that any "person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future deliver or any swap."  7 U.S.C. § 13a-1(a).

37.     Today there are 25 exchanges in the United States have active designations from the CFTC to operate as a contract market.  These DCMs include Crypto.com, Polymarket, and KalshiEx.

10

**B. State Attempts to Shut Down National Markets Drives Early Derivatives Regulation**

38. By the mid-nineteenth century, commodity exchanges in major trading hubs like New York and Chicago had organized trading to facilitate price discovery (information exchange), risk management (hedging), and speculation. But States and courts impeded these new markets, often failing to distinguish between futures trading and "gambling" or "wagering," with many states even prohibiting futures trading as a form of gambling. *See, e.g., Irwin v. Williar*, 110 U.S. 499, 508-09 (1884) (describing futures contracts as "nothing more than a wager"); *see also Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain").

39. Indeed, Illinois criminalized futures contracts. *See Melchert v. Am. Union Tel. Co.*, 11 F. 193, 196 (C.C.D. Iowa 1882) (quoting Ill. Rev. Stat. 1874, § 138). In 1888, the Illinois Supreme Court described "dealing in 'futures' or 'options'" as "a crime against the state, a crime against the general welfare and happiness of the people, a crime against religion and morality, and a crime against all legitimate trade and business." *Cothran*, 16 N.E. at 648.

40. Nevertheless, the Supreme Court and Congress acknowledged that futures markets served a valuable economic function and should be given room to develop. As Justice Holmes and the Supreme Court noted in *Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 247-48 (1905):

> People will endeavor to forecast the future, and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value [is] well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But legislatures and courts generally have recognized that the natural evolutions of a complex society are to be touched only with a very cautious hand, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain.

41.     Congress, recognizing the value of these new markets and the negative effects of a patchwork of state regulation, centralized the oversight and regulation of futures trading on federally regulated contract markets.  The first federal legislation designed to create a comprehensive federal regulatory framework for futures markets was the Future Trading Act of 1921, Pub. L. No. 67-66, 42 Stat. 187 (1921) ("21 Act"), followed by the Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 (1922) ("22 Act").  In passing these laws, Congress recognized the importance of uniform federal regulation of futures markets, even over objections that the new legislation would displace some States' regulations.  *Cf.* H.R. Rep. No. 67-1095, at 5 (1922) (Conf. Rep.) (objecting that the bill was "designed to . . . more or less eliminate some of the most important police powers of several sovereign States").

42.     Congress expanded federal oversight of futures markets in 1936 with the Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936).  But even as market participants expanded futures markets beyond their agricultural origins, those market participants continued to face the persistent threat of state prosecution through a patchwork of state laws and regulations.

**C.  Congress Gave the CFTC "Exclusive" Jurisdiction over Futures Trading in 1974**

43.     In 1973, futures exchanges recommended that "federal policy . . . be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions."  Review of Commodity Exch. Act and Discussion of Possible Change: Hearings Before the H. Comm. on Agric*.,* 93d Cong., 1st Sess. 121 (1973).  Congress quickly responded, explicitly addressing the issue the following year when it passed the Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 88 Stat. 1389 (1974) ("CFTC Act of 1974").

44.     With the passage of the CFTC Act of 1974, Congress amended the CEA to explicitly give the CFTC "exclusive jurisdiction" over commodity derivatives transactions

12

including futures, options, and swaps traded on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). The CFTC Act of 1974 amendments to the CEA worked a sea change in the regulation of U.S. derivatives markets in three critical ways. First, Congress established the CFTC, vesting in this federal executive agency the authority to administer the CEA. Second, Congress expanded the scope of the CEA to cover "all commodities." Third, Congress expressly gave the CFTC "exclusive jurisdiction" over U.S. commodity futures and options markets.

45. The CFTC Act of 1974 amended Section 2 of the CEA to provide that "the Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' . . . , and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 5 of this Act or any other board of trade, exchange, or market." CFTC Act of 1974, Section 201(b), 88 Stat. at 1395 (codified at 7 U.S.C. § 2(a)(1)).

46. Preemption was an express goal of the CFTC Act of 1974. Congress recognized the need for uniform, nationwide regulation of futures and options markets because concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos." *See* Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). Potentially limiting language was stricken from the statute "to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis). The CFTC Act of 1974 "preempt[ed] the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading

13

was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897.

**D. Congress Reinforced and Clarified the CFTC's Exclusive Jurisdiction After 1974**

47. Amendments to the CEA between 1978 and 2010 repeatedly reinforced and clarified the CFTC's exclusive jurisdiction over futures and options.

48. In the Futures Trading Act of 1978 ("78 Act"), Congress preserved the CFTC's exclusive authority over futures transactions on CFTC-regulated DCMs while clarifying the states' ability to pursue certain violations of the CEA against actors other than federally regulated exchanges. The 78 Act added a section to the CEA authorizing states to bring actions for injunctive or monetary relief for specified violations of the CEA and to enforce their "general civil or criminal antifraud" statutes. See 78 Act, Pub. L. 95-405, § 15(7), 92 Stat. 865, 873 (1978). Other than this explicit authorization of state authority, the CEA retained the broad preemption of state laws put in place in 1974. Proposals to carve off pieces of the CFTC's "exclusive" jurisdiction were rejected, because "[t]he nature of the underlying commodity is not an adequate basis to divide regulatory authority." S. Rep. No. 95-850, at 111-12 (1978), reprinted in 1978 U.S.C.C.A.N. 2087, 2110-11. That "a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC." *Id.* Congress also further added to the list of justifications supporting the CFTC's exclusive jurisdiction over commodity derivatives, citing concerns over "costly duplication and possible conflict of regulation or over-regulation." *Id.*

49. The Futures Trading Act of 1982 (the "82 Act") further clarified the scope of the CEA's preemption of other federal and state laws and the role of the States in pursuing illegal or fraudulent off-exchange transactions, while still recognizing "the CFTC['s] exclusive jurisdiction to regulate futures trading and enforce the provisions of the Act, thereby preempting any State

14

regulatory laws." H.R. Rep. No. 97-565, at 44-45 & 102-03 (1982), reprinted in 1982 U.S.C.C.A.N. 3871, 3893-94 & 3951-52. First, the 82 Act clarified the procedures for States to pursue violations of the CEA's anti-fraud provisions in state court. Second, the 82 Act clarified the role of states with respect to off-exchange futures transactions. Language was added to permit "criminal prosecution under any federal criminal statute" and the application of federal or state laws to off-exchange transactions or unregistered market participants. 82 Act, Pub. L. 97-444, § 229, 96 Stat. 2294, 2318 (1982). Other state laws that could arguably apply to DCMs and market participants registered with the CFTC remained preempted. See H.R. Rep. No. 97-565, at 44-45 & 102-103, 1982 U.S.C.C.A.N. at 3893-94, 3951-52. Congress explained that it "continue[d] to support the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures," "recognizing the somewhat esoteric nature of the commodity futures markets and the desire to have knowledgeable and uniform enforcement of the Act." *Id.*

50. In 1992, Congress again adjusted its regulatory framework to capture a new type of derivative financial product: swaps. In the Futures Trading Practices Act of 1992 ("92 Act"), Pub. L. 102-546, 106 Stat. 3590 (1992), Congress gave the CFTC authority to "exempt" certain off-exchange ("over-the-counter" or "OTC") swap transactions from the CEA's mandatory exchange trading regime for futures and options. The 92 Act added language to CEA Section 12(e), 7 U.S.C. § 16(e), expressly "supersed[ing] and preempt[ing] the application of any State or local" gambling or bucket shop laws as applied to OTC derivatives (swaps) transactions that the CFTC had exempted pursuant to its new authority in CEA Section 4(c), 7 U.S.C. § 6(c). While the 82 Act reserved to the States some authority to apply state and local laws to off-exchange futures transactions, the 92 Act cut back state authority for off-exchange swaps that received an exemption from the CFTC. Congress's goal was, again, to provide "legal certainty under both the Act and

15

state gaming and bucket shop laws for transactions covered by the terms of an exemption." H.R. Rep. No. 102-978, at 80 (1992) (Conf. Rep.), reprinted in 1992 U.S.C.C.A.N. 3179, 3212.

51.     Congress again limited the authority of States to regulate derivatives transactions in 2000 with the passage of the Commodity Futures Modernization Act of 2000 ("CFMA"), Pub. L. No. 106-554, Appendix E & § 103, 114 Stat. 2763A-365, 2763A-377 (2000).  The CFMA exempted or excluded swap transactions from the CEA's exchange trading requirements while also preempting the application of state and local laws to those "excluded" swap transactions.  The existing preemption of state and local laws as to on-exchange transactions therefore remained in place, and the preemption of state and local laws as to off-exchange transactions (exempt or excluded swaps) was expanded.

**E.  Congress Embraced Preemption for Swaps Transactions in the Dodd Frank Act**

52.     In the wake of the 2008 financial crisis, Congress reworked the regulatory structure for the swaps market, creating a framework within the CEA for the on-exchange execution, clearing and reporting of vast portions of those swaps.  The 2010 Dodd-Frank Act expressly extended the CFTC's "exclusive jurisdiction" to encompass "transactions involving swaps," eliminating the remaining concurrent jurisdiction of States as to off-exchange swap transactions. *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A).  After Dodd-Frank, Congress had removed all authority for States to regulate swaps of any kind, creating a complete framework for the CFTC's exclusive jurisdiction and occupying the regulatory field.

53.     In the Dodd-Frank Act, Congress made clear that the CFTC has exclusive jurisdiction over event contracts. In CEA § 5c(c)(5)(C) (codified at 7 U.S.C. § 7a-2(c)(5)(C)), Congress provided the CFTC with specific oversight and prohibitory authority over event contracts.  Under § 5c(c)(5)(C), the CFTC "may determine" that event contracts involving certain

16

categories "are contrary to the public interest" and may not be listed on CFTC-regulated markets.  7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii).

54. By creating a specific public interest review process, Congress signaled that these contracts belong within the CFTC's exclusive regulatory purview, not the States'.

**F.  The CFTC Uses Its Authority to Carry Out Congress's Directives**

55. The CEA confers on the CFTC the authority to make rules governing swaps and other futures and derivatives contracts.  See, *e.g.*, 7 U.S.C. §§ 2, 6, 6s, 7.  Pursuant to that authority, the CFTC has for decades promulgated rules that regulate a large, nationwide industry and which seek to provide clarity to the industry, market participants, and the public.  See 17 C.F.R. § 1.1, *et seq*.

56. Part of the CFTC's responsibilities include issuing guidance and promulgating new rules to provide certainty when markets change and innovate.  The CFTC already has extensive rules on what a DCM must do to become certified with the Commission, see 17 C.F.R. Part 38, and what a DCM must do to either self-certify a contract before listing, see 17 C.F.R. § 40.2, or to submit a contract for the CFTC to approve, see 17 C.F.R. § 40.3.

57. With respect to event contracts, the CFTC recently published an advisory letter to DCMs on prediction markets and event contracts, Prediction Markets Advisory, CFTC Letter No. 26-08 (Mar. 12, 2026) (see CFTC Prediction Markets Advisory Press Release, https://www.cftc.gov/PressRoom/PressReleases/9193-26 (last visited 3/18/2026)).

58. In order to provide additional clarity in the marketplace, the CFTC is in the process of writing and revising its rules applicable to event contracts and prediction markets.  On March 16, 2026, the CFTC published in the Federal Register an advance notice of proposed rulemaking soliciting public comments on prediction markets, 91 Fed. Reg. 12516 (Mar. 16, 2026).

## VI. ILLINOIS ISSUES CEASE AND DESIST LETTERS TO CFTC-DESIGNATED CONTRACT MARKETS

59. Illinois has issued cease and desist letters to three CFTC-regulated DCMs: KalshiEx, Crypto.com, and Polymarket. These letters threaten civil and criminal penalties against these entities for asserted violations of Illinois law.

60. Each of these DCMs provides event contracts available for trades, as regulated under the CEA and supervised by the CFTC. Each of these companies has been designated as a contract market under 17 C.F.R. Part 38 and lists these event contracts through the self-certification process outlined in 17 C.F.R. § 40.2 or the submission process outlined in 17 C.F.R. § 40.3.

61. On April 1, 2025, the Illinois Gaming Board issued a cease-and-desist letter to KalshiEx LLC d/b/a Kalshi, its CEO, and General Counsel. The letter accuses Kalshi of engaging in "illegal gambling in violation of Illinois law." The letter also states

    a. The IGB has reason to believe that Kalshi is "engaging in unlicensed sports wagering [and other conduct] in violation of the Illinois Sports Wagering Act, 230 ILCS 45, and Illinois Criminal Code, 720 ILCS 5/28-1(a)."

    b. "Under Illinois law, 'sports wagering' means accepting wagers on sports events or portions of sporting events, or on individual statistics of athletes in sports events or combination of sports events, by any system or method of wagering, including, but not limited to, in person or over the Internet through websites or on mobile devices. Sports wagering includes, but is not limited to, single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange wagering, in-game wagering, in-play bets, proposition bets, and straight bets. 230 ILCS 45/25-10."

    c. "It is unlawful to knowingly establish, maintain, or operate an Internet site that permits a person to play a game of chance or skill for money or other thing of value via the Internet, or that permits a person to make a wager upon the result of any sport, game, contest, political nomination, appointment, or election via the Internet without an IGB-issued license," and cites the following Illinois laws: 720 Ill. Comp. Stat. 5/28-1(a)(12); 230 Ill. Comp. Stat. 10/18(a)(1); 730 Ill. Comp. Stat. 5/5-4.5-55; Ill. Admin. Code tit. 11, § 1900.1210(a).

    d. "No person or entity may engage in a sports wagering operation or activity in Illinois unless licensed by the IGB. 230 ILCS 45/25-20(a)."

62.     The Illinois cease and desist letter to Kalshi states that Kalshi is engaged in sports wagering activity in Illinois over the Internet and on mobile devices.  The letter directs "Kalshi and anyone affiliated with its operations . . . to cease and desist this illegal activity," and states that "[f]ailure to comply may subject Kalshi to civil or criminal penalties."

63.     On April 1, 2025, the Illinois Gaming Board issued a cease and desist letter to "Crypto.com" and its CEO and President.  The letter accuses Crypto.com of engaging in "illegal gambling in violation of Illinois law."  The language of the letter mirrors the language of the cease-and-desist letter sent to Kalshi and accuses Crypto.com of violating the same provisions of Illinois law.  The letter directs "Crypto.com and anyone affiliated with its operations . . . to cease and desist this illegal activity" and states that "[f]ailure to comply may subject Crypto.com to civil or criminal penalties."

64.     On April 1, 2025, the Illinois Gaming Board issued a cease-and-desist letter to Robinhood and its CEO.  The letter accuses Robinhood of engaging in "illegal gambling in violation of Illinois law."  The language of the letter mirrors the language of the cease and desist letter sent to Kalshi and accuses Robinhood of violating the same provisions of Illinois law.  The letter directs "Robinhood and anyone affiliated with its operations … to cease and desist this illegal activity" and states that "[f]ailure to comply may subject Robinhood to civil or criminal penalties."

65.     On January 27, 2026, the Illinois Gaming Board issued a "cease and desist" letter to Polymarket US.  The language of the letter mirrors the language of the cease and desist letter sent to Kalshi and accuses Polymarket of violating the same provisions of Illinois law.  The letter directs "Polymarket and anyone affiliated with its operations … to cease and desist this illegal activity" and states that "[f]ailure to comply may subject Polymarket to civil or criminal penalties."

66.     Defendants' attempt to regulate these DCMs interferes with Plaintiffs' exclusive authority to uniformly regulate and monitor this congressionally defined market. The entire point of the CEA is to create a uniform and predictable nationwide market for futures trading, and the CFTC oversees that market via its certification process of DCMs and its requirements for DCMs to comply with the self-certification or submission certification requirements before listing event contracts. Defendants' letters and threatened legal actions would undermine that uniformity, thwart Congress's scheme, and intrude on Plaintiffs' exclusive jurisdiction by subjecting CFTC-regulated DCMs to regulation in all 50 states. Defendants' approach makes it much more difficult for the CFTC to regulate, advise, and enforce its authority over the DCMs, wasting resources and subverting CFTC's congressionally mandated authority.

## VII.  THE CHALLENGED ILLINOIS STATUTES ARE PREEMPTED AS APPLIED TO COMMODITIES DERIVATIVES CONTRACTS

67.     The Constitution's Supremacy Clause mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

68.     The CEA, as continuously refined over more than a century, gives the CFTC "exclusive jurisdiction" over futures and swaps traded on a DCM.  7 U.S.C. § 2(a)(1)(A). The CEA "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). "[P]reemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (quoting *Am. Ag. Movement v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992)).

69.  "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield."  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992)(internal citation omitted); *see Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (Under the Supremacy Clause, state laws that conflict with federal law are "without effect."); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (same); *Time Warner Cable v. Doyle*, 66 F.3d 867, 874 (7th Cir. 1995) ("Congress, in the exercise of the legislative authority granted to it by the Constitution, may preempt state law." (citation omitted)). "A federal law may preempt a state law expressly, impliedly through the doctrine of conflict preemption, or through the doctrine of field (also known as complete) preemption." *Boomer v. AT & T Corp.,* 309 F.3d 404, 417 (7th Cir. 2002).

70.  "Express preemption occurs when a federal statute explicitly states that it overrides state or local law." *Hoagland v. Town of Clear Lake,* 415 F.3d 693, 696 (7th Cir. 2005).  Congress explicitly preempted state regulation of commodity derivatives transactions, vesting the Commission with "exclusive jurisdiction," except as otherwise expressly provided by Congress, over all "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery."  7 U.S.C. § 2(a)(1)(A).  And Congress has repeatedly expanded the CFTC's "exclusive jurisdiction" through continual amendments, most recently to include "transactions involving swaps." *Id.*; see also ¶¶ 38-54, *supra*.  Congress therefore preempted state regulation of transactions subject to the CFTC's "exclusive jurisdiction," including swaps, and the DCMs that list them.

71.  Even without the express language of the CEA preempting state regulation, any state interference in DCM regulation is preempted because Congress "occupied the field" via the

CEA and the CFTC and because any attempt at state regulation conflicts with federal law. *See Boomer,* 309 F.3d at 417. In general, state law must give way if "Congress, acting within its proper authority, has determined must be regulated by its exclusive governance" or where "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

72. The scope of the CEA and the long history of Congress's amendments to ensure federal law captured the evolving futures and derivatives markets makes clear that Congress intended to occupy the field. A field is preempted from state regulation "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). Such is the case here. CEA § 2(a)(1)(A) makes plain that Congress intended the CEA to occupy the field of "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market . . . or any other board of trade, exchange, or market." When an instrument is trading on a CFTC-regulated market as a "swap" or "future," state gambling laws do not apply.

73. Offering event contracts on a DCM cannot, in and of itself, be an activity that is unlawful under any state law because such an application of state law would conflict with the CEA. "Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions." *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001).

74. A State applying local gambling laws to federally regulated DCMs also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Arizona*, 567 U.S. at 399 (internal citation omitted). To the extent state laws could apply to federally regulated swaps and derivatives, those laws are preempted as applied to those transactions and market participants because complying with both state and federal law would be an impossibility, and because those state laws, as applied, obstruct Congress's clear intent.

75. Complying with both state regulations and the CEA is impossible because a DCM is required by federal law to provide "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). If a state bans the contract, the DCM cannot fulfill its federal mandate to provide impartial national access. Other state-imposed restrictions on access to markets would similarly make it impossible for the regulated DCMs to comply with federal regulations. The CEA reflects Congress's understanding that commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, and surveillance of financial instruments traded in these markets to prevent the type of fragmented oversight at risk in this case. Complying with fractured state regulations would derail that goal.

76. State gambling regulations, as applied to DCMs, also "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation omitted). State gambling laws often require local licensing, fees, enforcement, and specific hardware. Applying state-by-state local requirements to national commodity exchanges would create the very "patchwork" that Congress set out to prevent. Indeed, the history of the CEA demonstrates repeated efforts by Congress to protect nationwide markets under uniform federal regulation as those markets evolve and as states attempt to limit them. See ¶¶ 38-54, *supra*.

77. In enacting the CEA and expanding it over time to provide the framework for commodity derivatives markets in the United States, Congress found that commodity derivatives

23

transactions "are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovery prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a).

78.     Therefore, the federal Commodity Exchange Act which provides the CFTC with "exclusive jurisdiction" over transactions on CFTC Designated Contract Markets, 7 U.S.C. § 2, preempts Illinois statutes that purport to prohibit, limit, or condition the listing or trading of event contract swaps on CFTC-Designated Contract Markets.

## VIII.  CLAIMS FOR RELIEF

### A. COUNT I – THE ILLINOIS SPORTS WAGERING ACT VIOLATES THE SUPREMACY CLAUSE AS APPLIED TO TRANSACTIONS ON CFTC DESIGNATED CONTRACT MARKETS

79.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

80.     The Illinois Sports Wagering Act, 230 Ill. Comp. Stat. 45/25, sets out a state regulatory scheme for sports wagering in Illinois.  As defined by the Sports Wagering Act, "sports wagering" means:

> a.   "accepting wagers on sports events or portions of sports events, or on the individual performance statistics of athletes in a sports event or combination of sports events, by any system or method of wagering, including, but not limited to, in person or over the Internet through websites and on mobile devices. "Sports wagering" includes, but is not limited to, single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange wagering, in-game wagering, in-play bets, proposition bets, and straight bets.

81.     The Illinois Sports Wagering Act, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is expressly preempted by the Commodity Exchange Act, 7 U.S.C. §§ 2(a)(1)(A), 16(e).

24

82.     The Illinois Sports Wagering Act, as applied to transactions listed, offered, or executed on Designated Contract Markets, is field preempted by Congress's grant of broad regulatory authority over this market to the CFTC in the Commodity Exchange Act, see generally, 7 U.S.C. § 2.

83.     The Illinois Sports Wagering Act, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is implicitly preempted because it makes it impossible for regulated DCMs to comply with federal law and obstacle preempted because it thwarts Congress's purpose in granting the CFTC exclusive regulatory authority over this market.

**B. COUNT II – THE ILLINOIS CRIMINAL CODE, 720 Ill. Comp. Stat. 5/28-1(a) VIOLATES THE SUPREMACY CLAUSE (PREEMPTION) AS APPLIED TO TRANSACTIONS ON CFTC DESIGNATED CONTRACT MARKETS**

84.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

85.     Article 28 of the Illinois Criminal Code of 2012 is titled "Gambling and Related Offenses." 720 Ill. Comp. Stat. 5/28. This law makes it a criminal offense to commit "gambling" absent an applicable exception. As defined by this statute, absent an applicable exception a person commits "gambling" when he or she:

    a.  knowingly plays a game of chance or skill for money or other thing of value;

    b.  knowingly makes a wager upon the result of any game, contest, or any political nomination, appointment or election;

    c.  knowingly operates, keeps, owns, uses, purchases, exhibits, rents, sells, bargains for the sale or lease of, manufactures or distributes any gambling device;

    d.  contracts to have or give himself or herself or another the option to buy or sell, or contracts to buy or sell, at a future time, any grain or other commodity whatsoever, or any stock or security of any company, where it is at the time of making such contract intended by both parties thereto that the contract to buy or sell, or the option, whenever exercised, or the

contract resulting therefrom, shall be settled, not by the receipt or delivery of such property, but by the payment only of differences in prices thereof;

e. knowingly owns or possesses any book, instrument or apparatus by means of which bets or wagers have been, or are, recorded or registered, or knowingly possesses any money which he has received in the course of a bet or wager;

f. knowingly sells pools upon the result of any game    or contest of skill or chance, political nomination, appointment or election;

g. knowingly transmits information as to wagers, betting odds, or changes in betting odds by telephone, telegraph, radio, semaphore or similar means; or knowingly installs or maintains equipment for the transmission or receipt of such information;

h. knowingly establishes, maintains, or operates an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of the Internet or to make a wager upon the result of any game, contest, political nomination, appointment, or election by means of the Internet.

86. These prohibitions are broad enough to encompass and criminalize as "gambling" many agreements, contracts and transactions offered on CFTC-Designated Contract Markets, including event contract swaps, even though these agreements, contracts and transactions are expressly permitted under the federal Commodity Exchange Act.

87. The Illinois Criminal Code makes an exemption for "sports wagering when conducted in accordance with the Sports Wagering Act." But this exception (1) does not apply to all agreements, contracts and transactions offered on CFTC-Designated Contract Markets since these DCMs offer far more than sports-related agreements, contracts and transactions; and (2) would require CFTC-Designated Contract Markets offering event contract swaps based on sporting events to comply with the Illinois Sports Wagering Act, which contains requirements that conflict with the federal Commodity Exchange Act and CFTC Regulations.

88. The Illinois Criminal Code, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is preempted by the federal Commodity Exchange Act, 7 U.S.C. § 2.

89. The Illinois Criminal Code, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is expressly preempted by the Commodity Exchange Act, 7 U.S.C. §§ 2(a)(1)(A), 16(e).

90. The Illinois Criminal Code, as applied to transactions listed, offered, or executed on Designated Contract Markets, is field preempted by Congress's grant of broad regulatory authority over this market to the CFTC in the Commodity Exchange Act, see generally, 7 U.S.C. § 2.

91. The Illinois Criminal Code, as applied to transactions listed, offered, or executed on Designated Contract Markets, is implicitly preempted because it makes it impossible for regulated DCMs to comply with federal law and obstacle preempted because it thwarts Congress's purpose in granting the CFTC exclusive regulatory authority over this market.

## C. COUNT III – THE ILLINOIS GAMBLING ACT VIOLATES THE SUPREMACY CLAUSE (PREEMPTION) AS APPLIED TO TRANSACTIONS ON CFTC DESIGNATED CONTRACT MARKETS

92. The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

93. The Illinois Gambling Act, 230 Ill. Comp. Stat. 10/18, makes it illegal under Illinois law for a person to, among other things:

    a. Conduct gambling where wagering is used or to be used without a license issued by the Board;

    b. Conduct gambling where wagering is permitted other than in the manner specified by Section 11; or

    c. permitting a person under 21 years to make a wager;

27

    d.   violate paragraph (12) of subsection (a) of Section 11 of this Act;

    e.   wager or accept a wager at any location outside the riverboat, casino, or organization gaming facility in violation of paragraph (1) or (2) of subsection (a) of Section 28-1 of the Criminal Code of 2012.

94.     The Illinois Gambling Act, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is preempted by the federal Commodity Exchange Act, 7 U.S.C. § 2.

95.     The Illinois Gambling Act, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is expressly preempted by the Commodity Exchange Act, 7 U.S.C. §§ 2(a)(1)(A), 16(e).

96.     The Illinois Gambling Act, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is field preempted by Congress's grant of broad regulatory authority over this market to the CFTC in the Commodity Exchange Act, see generally, 7 U.S.C. § 2.

97.     The Illinois Gambling Act, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is implicitly preempted because it makes it impossible for regulated DCMs to comply with federal law and obstacle preempted because it thwarts Congress's purpose in granting the CFTC exclusive regulatory authority over this market.

### IX.  RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

1.     That this Court enter a judgment declaring that the challenged provisions, as applied to CFTC-Designated Contract Markets, violate the Supremacy Clause and are therefore preempted, unconstitutional and invalid;

2.      That this Court issue a permanent injunction that prohibits Defendants as well as their successors, agents, and employees, from enforcing the challenged provisions as applied to CFTC-Designated Contract Markets;

3.      That this Court award Plaintiffs their costs and fees in this action; and

4.      That this Court award any other relief it deems just and proper.

Dated: April 2, 2026

By:      */s/ Alexandra McTague*
        Alexandra McTague
        Senior Litigation Counsel
        U.S. Department of Justice Civil Division
        Enforcement & Affirmative Litigation Branch
        450 5th Street, NW, Suite 6400-South
        Washington, D.C. 20530
        Tel. 202-718-0483
        Alexandra.mctague2@usdoj.gov

*Attorneys for the United States of America*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

TIBERIUS DAVIS
Counsel to the Assistant Attorney General

*Attorneys for the Commodity Futures Trading Commission*

Tyler S. Badgley
    General Counsel
M. Jordan Minot
    Deputy General Counsel
Anne Stukes
    Senior Assistant General Counsel
Carlin Metzger
(Ill. ARDC No. 6275516)
    Assistant General Counsel
U.S. Commodity Futures Trading Commission
Ralph Metcalfe Federal Building
77 W. Jackson, Suite 800
Chicago, IL 60604
Tel:  (202) 209-1087
Fax:  (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
astukes@cftc.gov
cmetzger@cftc.gov