IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE COMMODITY FUTURES TRADING COMMISSION,<br><br> Plaintiffs,<br><br>v.<br><br>STATE OF ILLINOIS; JB PRITZKER, the Governor of Illinois in his official capacity; KWAME RAOUL, in his official capacity as Attorney General of Illinois; DIONNE R. HAYDEN, in her official capacity as Chairperson of the Illinois Gaming Board; SEAN BRANNON, in his official capacity as Member of the Illinois Gaming Board; STEPHEN R. FERRARA, in his official capacity as Member of the Illinois Gaming Board; CALEB J. MELAMED, in his official capacity as Member of the Illinois Gaming Board; and MARCUS D. FRUCHTER, in his official capacity as Administrator of the Illinois Gaming Board,<br><br>Defendants. | **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br><br>Case No.: 26-cv-3659<br><br>Honorable Martha M. Pacold |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 4

I.  The CEA provides the regulatory framework for commodity derivatives markets in the United States, including event-contract markets ....................................................... 4

II.  Congress has steadily expanded the Commission's jurisdiction and contracted state jurisdiction over derivatives trading............................................................................... 5

III.  Event contracts have long traded subject to Commission oversight ....................................... 8

IV.  Illinois issues cease-and-desist letters threatening civil and criminal penalties to CFTC-designated contract markets ...................................................................................... 9

V.  Illinois imposes a special fee that applies only to sports event contracts offered by CFTC-regulated markets........................................................................................................ 10

LEGAL STANDARD ............................................................................................................ 11

ARGUMENT ...................................................................................................................... 11

I.  Plaintiffs Have Standing................................................................................................ 12

II.  Plaintiffs are likely to succeed in establishing that federal law preempts Illinois law as applied to commodity derivatives transactions .................................................................. 15

    A.  Event contracts are "swaps" under the CEA ............................................................. 15

    B.  The CEA preempts state law ................................................................................ 18

III.  The remaining factors favor granting preliminary relief........................................................ 24

CONCLUSION.................................................................................................................... 27

i

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Alabama Power Co. v. Costle*,
  636 F.2d 323 (D.C. Cir. 1979) ................................................................................. 16

*American Agric. Movement, Inc. v. Board of Trade of Chicago*,
  977 F.2d 1147 (7th Cir. 1992) ................................................................................. 24

*Arizona v. United States*,
  567 U.S. 387 (2012) .......................................................................................... 18, 21

*Atlantic Richfield Co. v. Christian*,
  590 U.S. 1 (2020) ..................................................................................................... 21

*Cargill, Inc. v. Hardin*,
  452 F.2d 1154 (8th Cir. 1971) ................................................................................... 5

*Carson v. Milwaukee Produce Co.*,
  113 N.W. 393 (Wis. 1907) ......................................................................................... 6

*CFTC v. Spagnuolo*,
  No. 1:26-cv-4419 (S.D.N.Y.) ............................................................................... 9, 27

*CFTC v. Van Dyke*,
  No. 1:26-cv-3369 (S.D.N.Y.) ............................................................................... 9, 27

*Chamber of Com. of U.S. v. Whiting*,
  563 U.S. 582 (2011) ................................................................................................. 18

*Christensen Hatch Farms, Inc. v. Peavey Co.*,
  505 F. Supp. 903 (D. Minn. 1981) ........................................................................... 19

*Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*,
  162 F.4th 631, (6th Cir. 2025) .................................................................................. 26

*Cigna Corp. v. Bricker*,
  103 F.4th 1336 (8th Cir. 2024) ................................................................................ 25

*Cohn v. Brinson*,
  73 So. 59 (Miss. 1916) ............................................................................................... 6

*Coinbase Financial Markets, Inc. v. Kwame Raoul, et al.*,
  Case No.: 1:25–cv–15406 ..................................................................................... 2, 25

*CoreCivic, Inc. v. Governor of New Jersey*,
 145 F.4th 315 (3d Cir. 2025) ...................................................................... 24

*Cothran v. Ellis*,
 16 N.E. 646 (Ill. 1888) ................................................................................ 5

*Cunningham v. National Bank of Augusta*,
 71 Ga. 400 (1883) ....................................................................................... 6

*Department of Commerce v. New York*,
 588 U.S. 752 (2019).................................................................................... 14

*Dickson v. Uhlmann Grain Co.*,
 288 U.S. 188 (1933)...................................................................................... 6

*Effex Capital, LLC v. National Futures Ass'n*,
 933 F.3d 882 (7th Cir. 2019) ............................................................... 19, 22

*FTC v. Ken Roberts Co.*,
 276 F.3d 583 (D.C. Cir. 2001) ..................................................................... 7

*Geo Grp., Inc. v. Newsom*,
 50 F.4th 745 (9th Cir. 2022) ...................................................................... 24

*Hughes v. Talen Energy Mktg., LLC*,
 578 U.S. 150 (2016)..................................................................................... 18

*KalshiEX LLC v. Johnson*,
 __ F. Supp. 3d __, 2026 WL 1223373 (D. Ariz. May 5, 2026)....................... *passim*

*KalshiEX LLC v. Martin*,
 793 F. Supp. 3d 667 (D. Md. 2025) ............................................................ 20

*KalshiEX v. Orgel*,
 No. 3:26-cv-34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026)....................... 3, 16, 26

*KalshiEX, LLC v. Flaherty*,
 172 F.4th 220 (3d Cir. 2026) ................................................................ *passim*

*Kansas v. Garcia*,
 589 U.S. 191 (2020)..................................................................................... 21

*Leist v. Simplot*,
 638 F.2d 283 (2d Cir. 1980)........................................................................ 19

iii

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................................................................. 12

*Merrill Lynch Int'l v. XL Cap. Assur. Inc.*,
  564 F. Supp. 2d 298 (S.D.N.Y. 2008) ...................................................................... 20

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982) ........................................................................................... *passim*

*Mohr v. Miesen*,
  49 N.W. 862 (Minn. 1891) ........................................................................................ 5

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) .................................................................................................. 25

*Murphy v. National Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) .................................................................................................. 21

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................................................. 11

*Pharmacy Rsch. & Manufacturers of Am. v. McClain*,
  95 F.4th 1136 (8th Cir. 2024) .................................................................................. 23

*Preston v. Thompson*,
  589 F.2d 300 (7th Cir. 1978) .............................................................................. 24, 26

*Rice v. Board of Trade of Chicago*,
  331 U.S. 247 (1947) .................................................................................................... 6

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) .................................................................................................. 12

*Stuber v. Hill*,
  170 F. Supp. 2d 1146 (D. Kan. 2001) ...................................................................... 21

*Texas Midstream Gas Servs., LLC v. City of Grand Prairie*,
  608 F.3d 200 (5th Cir. 2010) .................................................................................... 24

*Thrifty Oil Co. v. Bank of Am. National Tr. & Sav. Ass'n*,
  322 F.3d 1039 (9th Cir. 2003) .................................................................................. 20

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) .......................................................................... 25, 26

iv

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) ...................................................................... 24

*United States v. Ekblad*,
732 F.2d 562 (7th Cir. 1984) ......................................................................... 12

*United States v. Florida*,
172 F.4th 1201 (11th Cir. 2026) ..................................................................... 13

*United States v. Missouri*,
114 F.4th 980 (8th Cir. 2024) ........................................................................ 12

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) ......................................................................... 15

*United States v. Texas*,
97 F.4th 268 (5th Cir. 2024) ......................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ......................................................................................... 11

Statutes

31 U.S.C. § 5362(10)(A) ................................................................................. 17

7 U.S.C. § 1a(47)(A), CEA § 1a(47)(A) .............................................. 7, 15, 16

7 U.S.C. § 2(a)(1), CEA § 2(a)(1) ........................................................ *passim*

7 U.S.C. § 5, CEA § 3 ................................................................................ 4, 12

7 U.S.C. § 7, CEA § 5 ...................................................................................... 5

7 U.S.C. § 7a-2(c)(5)(C), CEA § 5c(c)(5)(C) ........................................ 7, 17, 22

7 U.S.C. § 13a-2, CEA § 6d ........................................................................... 19

7 U.S.C. § 16(e), CEA § 12(e) .................................................................. 19, 20

7 U.S.C. § 16(h), CEA § 12(h) ...................................................................... 20

730 ILCS 5/5-4.5-55 ...................................................................................... 10

Commodity Futures Trading Commission Act of 1974,
Pub. L. No. 93-463, 88 Stat. 1389 (1974) ...................................................... 6

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   Pub. L. No. 111-203, 124 Stat. 1376 (2010) .............................................................. 7

Ill. Admin. Code, tit. 11, § 1900.1210(a) ............................................................ 1, 10, 27

Illinois Criminal Code,
   720 ILCS 5/28-1(a) .............................................................................................. 1, 27

   720 ILCS 5/28-1(a)(12) ........................................................................................ 10, 16

   720 ILCS 5/28-1(b)(15) ............................................................................................ 26

Illinois Gambling Act,
   230 ILCS 10/1 *et seq.* ...................................................................................... 1, 10, 27

Illinois Sports Wagering Act,
   230 ILCS 45/25-1 *et seq.* ............................................................................ 1, 10, 11, 27

S.B. 3019, 104th Gen. Assemb., Reg. Sess. (Ill. 2026) ........................................... 10, 11

Regulations

17 C.F.R. § 38.150(a) ................................................................................................. 5

17 C.F.R. § 38.151(b) ............................................................................................... 23

17 C.F.R. § 38.200 ..................................................................................................... 5

17 C.F.R. § 40.11(c)(2) ............................................................................................ 22

17 C.F.R. § 40.2 ......................................................................................................... 9

17 C.F.R. § 40.3 ......................................................................................................... 9

Concept Release on the Appropriate Regulatory Treatment of Event Contracts,
   73 Fed. Reg. 25,669 (May 7, 2008) ........................................................................ 8

Prediction Markets; Public Interest Determinations,
   91 Fed. Reg. 35,806 (June 12, 2026) ...................................................................... 9

Legislative Materials

120 Cong. Rec. S 30458 (Sept. 9, 1974) ................................................................. 7, 22

H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Rep.) ........................................... 7, 22

Hearings Before the S. Comm. on Agric. & Forestry on
S. 2485, S. 2578, S. 2837, H.R. 13113,
93d Cong., 2d Sess. 685 (1974) .................................................................................. 24

S. Rep. No. 93-1131, at 6 (1974) ................................................................................... 7

Other Authorities

CFTC Staff Letter No. 93-66 (June 18, 1993),
https://www.cftc.gov/sites/default//files/idc/groups/
public/@lrlettergeneral/documents/letter/93-66.pdf..................................................... 8

CFTC, Contracts & Products,
https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm ..................................... 8

CFTC, Futures Glossary: A Guide to the Language of the Futures Industry,
https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/
CFTCGlossary/index.htm. ..................................................................... 4

CFTC, Release Number 9199-26,
*CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026),
https://www.cftc.gov/PressRoom/PressReleases/9199-26 ........................................ 9

CFTC, Release Number 9235-26 (May 21, 2026),
*CFTC and National Hockey League Sign MOU Related to
Integrity in Professional Hockey*,
https://www.cftc.gov/PressRoom/PressReleases/9235-26 ........................................ 9

Illinois Gaming Board, Cease and Desist Letters,
https://igb.illinois.gov/sports-wagering/cease-and-desist-letters.html........................................ 9

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*,
58 Chicago-Kent L. Rev. 657, 670 (1982)..................................................................... 6

William W. Mansfield, *A Digest of the Statutes of Arkansas* § 1848
(U.M. Rose ed., 1884)................................................................................................ 6

Under Federal Rule of Civil Procedure 65(a), Plaintiffs the United States of America and the Commodity Futures Trading Commission ("CFTC" or "Commission") respectfully ask this Court to preliminarily enjoin Defendants from enforcing Illinois's gambling laws, including but not limited to the Illinois Gambling Act, 230 ILCS 10/1 *et seq.*, the Illinois Sports Wagering Act, 230 ILCS 45/25-1 *et seq.*, the Illinois Criminal Code, 720 ILCS 5/28-1(a), and the Illinois Administrative Code, 11 Ill. Admin. Code 1900.1210(a), through any criminal or civil enforcement actions related to event contracts listed on CFTC-regulated designated contract markets, including by engaging in any subpoena process or other compulsory investigative process related to event contracts listed on CFTC-regulated designated contract markets.

## PRELIMINARY STATEMENT

Plaintiffs the United States and the Commodity Futures Trading Commission seek a preliminary injunction prohibiting Illinois from continuing its targeted campaign of regulatory hostility against prediction markets. Plaintiffs initiated this action after Defendants threatened to impose criminal and civil penalties under Illinois's gambling laws on companies that operate CFTC-regulated online marketplaces offering CFTC-approved event contracts without a state gambling license. Since then, Illinois has only ramped up its efforts to shut down these federally regulated markets.

Yesterday, Governor Pritzker signed into law a new gambling regulation that singles out CFTC-regulated exchanges offering sports event contracts and requires those exchanges to pay a special fee that applies only to those exchanges. This additional fee, which purports to apply in addition to the taxes and license fees that Illinois charges the casino and sportsbook gambling operators that it has traditionally regulated, likely meets or exceeds the transaction fees charged

1

by DCMs, effectively banning DCMs from operating in the State, even if the DCMs tried to comply with Illinois gambling laws.

Illinois's newest gambling law that it seeks to apply to CFTC-regulated exchanges demonstrates the State's continued eagerness to force CFTC-regulated Designated Contract Markets ("DCMs") to cease operating in the state or else pay a steep premium and comply with a state regulatory scheme that directly conflicts with federal law. Illinois would have this Court believe that it is "not enforcing state laws against prediction markets or related entities . . . while the Court is considering the preliminary injunction motion in the *Coinbase* case." Dkt. No. 25 at 4; Dkt. No. 29 at 2 (stating that the CFTC "ignores the fact . . . that 'Illinois officials are not enforcing state laws against prediction markets'"). But Illinois offers nothing more than its say-so; it has agreed to halt enforcement against Coinbase, see *Coinbase Financial Markets, Inc. v. Kwame Raoul, et al.*, Case No.: 1:25–cv–15406, Dkt. 30 at 2 (Dec. 29, 2025), but has not offered a similar agreement extending to all markets with the CFTC, and its new fee targeted specifically at event contracts belies that the State has paused its efforts to shut down federally regulated markets. The new law, just as with Illinois's previous efforts to apply its gambling laws to federally regulated DCMs, intrudes on the Commission's exclusive jurisdiction to regulate derivatives trading on federally regulated marketplaces, violates the Supremacy Clause of the United States Constitution, and is therefore preempted and unenforceable.

Under the Commodity Exchange Act ("CEA"), the event contracts that Illinois seeks to prohibit are "swaps," and the "prediction markets" on which these event contracts trade include CFTC-regulated DCMs. The CEA expressly confers "exclusive jurisdiction" upon the Commission to regulate, among other things, "transactions involving swaps" that are traded on DCMs. 7 U.S.C. § 2(a)(1)(A). More broadly, the Act provides a "comprehensive regulatory

structure [for] oversee[ing] the volatile and esoteric futures trading complex" that is administered—and administered only—by the Commission. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). State law that purports to regulate or prohibit transactions involving swaps is therefore preempted.

Illinois is far from the first state to intrude into the Commission's regulatory jurisdiction over event contracts—and courts have been swift to respond with injunctive relief. In April 2026, the Third Circuit upheld a preliminary injunction barring New Jersey from enforcing its gambling laws against sports event contracts listed by KalshiEX, a CFTC-regulated DCM. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 232 (3d Cir. 2026). And the District of Arizona and the Middle District of Tennessee have entered preliminary injunctions enjoining states from enforcing their gambling laws as applied to sports event contracts listed on CFTC-regulated DCMs. *KalshiEX LLC v. Johnson*, __ F. Supp. 3d __, 2026 WL 1223373, at *9 (D. Ariz. May 5, 2026); *KalshiEX v. Orgel*, No. 3:26-cv-34, 2026 WL 474869, at *12 (M.D. Tenn. Feb. 19, 2026).

The case for emergency injunctive relief here is even stronger. If threatening DCMs with civil and criminal penalties wasn't destructive enough, the state now purports to target DCMs offering sports event contracts with a prejudicial fee that applies only to "exchange wagers." Moreover, Defendants have threatened to enforce state gambling laws with respect not only to sports contracts, but also to contracts concerning elections and other political events with wide-ranging economic consequences introducing risk against which marketplace participants naturally will seek to hedge. Illinois's crusade to ban or severely encumber the trade in derivatives contracts is precisely what Congress sought to prevent by passing the Commodity Exchange Act and creating a uniform federal regulatory scheme. The Court should enjoin Defendants' application of

Illinois law to activities exclusively regulated by the Commission because it blatantly violates the Supremacy Clause and undermines Congress's express directives.

## BACKGROUND

**I.      The CEA provides the regulatory framework for commodity derivatives markets in the United States, including event-contract markets**

The CEA provides a comprehensive framework that governs transactions in United States commodity derivatives markets. The CFTC is the federal executive agency that administers the CEA, enforces its provisions in federal courts, and regulates derivatives markets. A "derivative" is a financial instrument, such as a future, option, or swap, for which the price is directly dependent upon—that is, "derived from"—the value of something else, such as an agricultural or financial commodity.[1] In general, market participants use derivatives to hedge risks or speculate on commodity price movements.

In enacting the CEA, Congress specifically identified a public interest in federal regulation of derivatives markets because those markets provide a means to distribute economic risks via hedging and speculation. *See* 7 U.S.C. § 5. "Hedging" involves the use of derivatives to protect against price fluctuations.[2] Like securities markets, commodity derivatives markets also include "speculators" who profit from price movements. Speculators are important because they help ensure that hedgers can find counterparties with whom to trade, thereby fostering price discovery

---

[1] CFTC, Futures Glossary: A Guide to the Language of the Futures Industry, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm.

[2] For instance, airlines that need to buy jet fuel in the foreseeable future might manage the risk that the price will increase by entering into a derivative contract, *e.g.* a futures contract, to hedge against that risk. It would take a "long" position, *i.e.*, a futures contract that will increase in value if the price of fuel increases. On the other hand, a fuel supplier might manage the risk that the price of oil will decline by taking a "short" position, *i.e.*, a futures contract that will increase in value if the price of fuel goes down.

and liquidity in the markets. *See generally Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1158 (8th Cir. 1971).

Many derivatives must be traded on a Designated Contract Market, or DCM. DCMs are national boards of trade or exchanges that operate under the regulatory oversight of the Commission. *See* 7 U.S.C. § 7. The Commission designates an exchange as a DCM through a formal application process in which an applicant must demonstrate its ability to comply with detailed statutory and regulatory requirements called "core principles." *Id.* § 7(d). These core principles require DCMs to, among other things, establish and enforce compliance with market rules, 17 C.F.R. § 38.150(a); list only contracts that are not readily susceptible to manipulation, *id.* § 38.200; and have the capacity to prevent manipulation or price distortions, *id.* § 38.250. Today, 25 exchanges in the United States have active designations from the Commission to operate as a DCM.

**II.    Congress has steadily expanded the Commission's jurisdiction and contracted state jurisdiction over derivatives trading**

Illinois's attempt to ban derivatives trading is nothing new—indeed, Illinois was once at the forefront of trying to ban futures contracts as unlawful gambling. Before Congress entered the field of futures regulation, States often failed to distinguish between futures trading and illegal "gambling" or "wagering." Indeed, Section 178 of the Illinois Criminal Code provided that "the option to sell or buy at a future time any grain or commodity . . .. . . shall be considered gambling contracts, and shall be void." *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888). The Minnesota Supreme Court described "betting upon the price of wheat, [as] against public policy, and not only void, but deserving of the severest censure." *Mohr v. Miesen*, 49 N.W. 862, 863 (Minn. 1891) (quoting *Rumsey v. Berry*, 65 Me. 570, 574 (1876)). Likewise, the Georgia Supreme Court described futures contracts for cotton as "speculation on chances, a wagering and betting between

the parties." *Cunningham v. National Bank of Augusta*, 71 Ga. 400, 403 (1883). And so on. *See Cohn v. Brinson*, 73 So. 59, 62 (Miss. 1916) (describing "the buying of cotton futures [as] a wager"); *Carson v. Milwaukee Produce Co.*, 113 N.W. 393, 395 (Wis. 1907) (describing commodity futures contracts as "gambling contracts" that are "void"); William W. Mansfield, *A Digest of the Statutes of Arkansas* § 1848 (U.M. Rose ed., 1884) (declaring that "[t]he buying or selling or otherwise dealing in what is known as futures . . . with a view to profit, is hereby declared to be gambling").

Congress, by contrast, "has recognized the potential hazards as well as the benefits of futures trading," and it accordingly "has authorized the regulation of commodity futures exchanges for over [100] years," beginning with the Future Trading Act of 1921 and Grain Futures Act of 1922. *Curran*, 456 U.S. at 360. Those early federal forays into futures regulation, however, failed to preempt state law. *See Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933) (holding that federal law "did not supersede any applicable provisions of [] Missouri law making gambling in grain futures illegal").

The CEA, enacted in 1936, broadened the federal government's regulatory authority over futures trading and prompted a "[g]radual state retreat from . . . the entire field of commodities futures regulation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chicago-Kent L. Rev. 657, 670 (1982). But the Supreme Court again held that States could regulate aspects of commodities trading, explaining that Section 4c of the CEA "serves the function of preventing supersedure and preserving state control in [] areas where state and federal law overlap." *Rice v. Board of Trade of Chicago*, 331 U.S. 247, 255 (1947).

The key turning point came in 1974, when Congress created the Commission and conferred on it "exclusive jurisdiction" over futures trading. Pub. L. No. 93-463, § 201(b), 88 Stat. 1389,

6

1395 (1974) (codified at 7 U.S.C. § 2(a)(1)(A)). "The aim of this provision" was to "'avoid unnecessary, overlapping and duplicative regulation.'" *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001). The 1974 Act also removed Section 4c "[i]n order to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974). Leading proponents of the Act repeatedly indicated that futures regulation would be subject solely to Commission oversight, not state law. *See, e.g.*, H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Report) (explaining that the "exclusive grant of jurisdiction to the Commission" would "preempt the field insofar as futures regulation is concerned," and that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern"); S. Rep. No. 93-1131, at 6 (1974) (stating that the Commission's "jurisdiction, where applicable, supersedes State as well as Federal agencies").

Congress has further expanded the preemptive reach of the CEA over the subsequent decades—particularly with respect to "swaps." A "swap" is a type of derivative that encompasses "any agreement, contract, or transaction . . . that provides for any . . . payment[ ] or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). In the 2010 Dodd-Frank Act, Congress extended the Commission's "exclusive jurisdiction" to encompass "accounts, agreements . . ., and transactions involving swaps." Pub. L. No. 111-203, § 722(a)(1)(D), 124 Stat. 1376, 1672 (2010) (codified at 7 U.S.C. § 2(a)(1)(A)). It also added a "Special Rule" granting the Commission authority to prohibit certain swaps called "event contracts" if the Commission determines they are contrary to the public interest. *Id.* § 745(a), 124 Stat. at 1736–37 (codified at 7 U.S.C. § 7a-2(c)(5)(C)).

7

### III.    Event contracts have long traded subject to Commission oversight

"Event contracts" are CFTC-regulated "derivative contract[s] whose payoff is based on a specified event, occurrence, or value."[3] While event contracts have become more popular with the American public in recent years, these contracts are not novel innovations. "Since 1992, Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on" events "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." 73 Fed. Reg. 25,669, 25,671 (May 7, 2008). In 1993, the Commission issued a no-action letter to Iowa Electronic Markets, allowing the facility to list event contracts tied to U.S. and Canadian elections.[4] And by 2005, event contracts encompassed "the accomplishment of certain scientific advances, world population levels, the adoption of particular pieces of legislation," and even "the length of celebrity marriages." 73 Fed. Reg. at 25,670.

Today, event contracts are listed on numerous CFTC-registered DCMs, whether they be relatively new markets like KalshiEX ("Kalshi"), QCX ("Polymarket"), and Gemini Titan, or longstanding ones like North American Derivatives Exchange ("Nadex") and CME Group. The Commission exercises its exclusive jurisdiction over the transactions on these DCMs by, among other things, requiring them to complete a registration process with the Commission before listing products for trading, monitoring their activity, and pursuing enforcement actions as appropriate.

The Commission is also taking additional steps to ensure market integrity around the trading of event contracts. The Commission has signed Memoranda of Understanding with Major

---

[3]    CFTC, *Contracts & Products*, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm.

[4] CFTC Staff Letter No. 93-66 (June 18, 1993), https://www.cftc.gov/sites/default//files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf.

8

League Baseball and the National Hockey League, which establish a framework for the leagues to exchange information with the Commission to permit information sharing to ensure market integrity in sports-related event contracts.[5] The Commission filed enforcement actions against a U.S. servicemember who used sensitive nonpublic information to trade event contracts related to the ouster of Venezuelan President Nicolás Maduro and a Google employee who used confidential company information to trade event contracts related to year-end Google search results rankings. *See CFTC v. Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y.); *CFTC v. Spagnuolo*, No. 1:26-cv-4419 (S.D.N.Y.). And most recently, the Commission issued a Notice of Proposed Rulemaking proposing amendments to its rules concerning event contracts. *See* 91 Fed. Reg. 35,806 (June 12, 2026).

**IV.   Illinois issues cease-and-desist letters threatening civil and criminal penalties to CFTC-designated contract markets**

Illinois has issued cease-and-desist letters threatening civil and criminal penalties against three CFTC-regulated DCMs (Kalshi, Crypto.com, and Polymarket) and a CFTC-designated Futures Commission Merchant (Robinhood) that partners with DCMs to offer event contract swaps. Each of the letters accuses the recipient of "illegal gambling in violation of Illinois law."[6]

Kalshi, Crypto.com, and Polymarket provide event contracts for trading, supervised by the CFTC and regulated by the CEA. Each has been designated as a contract market under 17 C.F.R. Part 38 and lists event contracts through the self-certification process outlined in 17 C.F.R. § 40.2 or the submission process outlined in 17 C.F.R. § 40.3.

---

[5] CFTC, Release Number 9199-26, *CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026), https://www.cftc.gov/PressRoom/PressReleases/9199-26; CFTC, Release Number 9235-26 (May 21, 2026), https://www.cftc.gov/PressRoom/PressReleases/9235-26.

[6] Illinois Gaming Board, Cease and Desist Letters, https://igb.illinois.gov/sports-wagering/cease-and-desist-letters.html.

On April 1, 2025, the Illinois Gaming Board ("the Board") issued virtually identical cease-and-desist letters to Kalshi, Crypto.com, and Robinhood. The letters allege that the Board "has reason to believe" that the recipients are "engaging in unlicensed sports wagering [and other conduct] in violation of the Illinois Sports Wagering Act." The letters assert that it is "unlawful" to operate a website "that permits a person to play a game of chance or skill for money . . . or that permits a person to make a wager upon the result of any sport, game, contest, political nomination, appointment, or election via the Internet without an IGB-issued license."[7] And the letters direct each company "and anyone affiliated with its operations . . . to cease and desist this illegal activity," and declare that "[f]ailure to comply may subject Kalshi to civil or criminal penalties."[8]

On January 27, 2026, the Board issued a cease-and-desist letter to Polymarket with the same assertions and threats of enforcement of Illinois's gambling laws for offering CFTC-regulated contracts.

## V. Illinois imposes a special fee that applies only to sports event contracts offered by CFTC-regulated markets

On June 16, 2026, Governor Pritzker signed the Fiscal Year 2027 state budget.[9] The budget codified S.B. 3019's amendments to 230 ILCS 45/25-90, part of Illinois's gambling laws. The bill includes a transaction fee on every "exchange wager," defined as "an agreement, contract, transaction, or swap that is offered, traded, or executed on a prediction market or exchange tied to a sporting contest or sporting event." 230 ILCS 45/25-10 & 45/25-90(d-20) (as amended by S.B. 3019, 104th Gen. Assemb., Reg. Sess. (Ill. 2026) at 1281, 1289). The law does not define

---

[7] The letter cites the following Illinois laws: 720 ILCS 5/28-1(a)(12); 230 ILCS 10/18(a)(1); 730 ILCS 5/5-4.5-55; and Ill. Admin. Code tit. 11, § 1900.1210(a).

[8] *Id.*

[9] Gov. Pritzker Signs Eighth Consecutive Balanced Budget (June 16, 2026), https://gov-pritzker-newsroom.prezly.com/gov-pritzker-signs-eighth-consecutive-balanced-budget.

10

"prediction market or exchange," and the fee purports to apply, "[i]n addition to all other taxes and payments owed under" the Sports Wagering Act. *Id.*

The amendments to the Sports Wagering Act impose a 1.75% transaction fee on a prediction market or exchange's first five million "exchange wagers" and a 3.5% fee on all subsequent "exchange wagers" traded in the same fiscal year. Those fees will often equal or exceed the transaction fees that DCMs, like Kalshi, charge for each trade. *See, e.g.,* Kalshi Fee Schedule, Kalshi.com/docs/kalshi-fee-schedule.pdf (describing, for example, how a $50 transaction of 100 contracts at $0.50 would incur a fee of $1.75, or 3.5% of the transaction). These fees appear to begin accumulating as of the bill's signing, S.B. 3019 § 999-99, 104th Gen. Assemb., Reg. Sess. (Ill. 2026) at 1624), and fees for "exchange wagers" traded in June of this year will be due on July 31, 230 ILCS § 45/25-90(d-15) & (d-20) (as amended by S.B. 3019, 104th Gen. Assemb., Reg. Sess. (Ill. 2026) at 1289).

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the federal government is a party, the balance of equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

Congress conferred on the CFTC "exclusive jurisdiction" to regulate swaps traded on exchanges regulated by the Commission. Illinois cannot extend its gambling laws beyond the casino and sportsbook gambling that it has traditionally regulated to markets subject to exclusive federal jurisdiction, and its attempts to extend its state law into this area is preempted. Illinois's

11

attempts to intimidate federally regulated entities, via threats of criminal enforcement and special transition fees, interfere with Plaintiffs' exclusive authority to uniformly regulate and monitor this congressionally defined market and disrupts the operation of those markets both in Illinois and nationwide. The CEA exists to create a uniform and predictable nationwide market for futures trading, which is "affected with a national public interest." 7 U.S.C. § 5(a). Defendants' threatened legal actions and legislative enactments undermine that uniformity, thwart Congress's scheme, and intrude on Plaintiffs' exclusive jurisdiction by subjecting DCMs to a patchwork of fragmented and often conflicting state laws. This not only impedes the CFTC's ability to regulate, advise, and enforce its authority over DCMs but also saddles market participants with excessive compliance costs and uncertainty, stifling one of the CEA's animating purposes: "to promote responsible innovation and fair competition." 7 U.S.C. § 5(b). This Court should enter a preliminary injunction prohibiting Defendants from enforcing Illinois law insofar as they seek to regulate derivatives exchanged on markets regulated by the CFTC.

## I. Plaintiffs Have Standing

Standing requires Plaintiffs to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish an injury in fact, Plaintiffs must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

When the United States brings an action based on federal preemption of state law, it exercises its "standing to seek relief from actual or threatened interference with the performance of its proper governmental functions." *United States v. Ekblad*, 732 F.2d 562, 563 (7th Cir. 1984); *see United States v. Missouri*, 114 F.4th 980, 985 (8th Cir. 2024) ("Interference with the federal

12

government's interest in enforcing federal law is sufficient to establish that the Act's implementation injured the United States. Whether the United States is entitled to relief from that injury is a question on the merits of the dispute."); *United States v. Florida*, 172 F.4th 1201, 1222 (11th Cir. 2026) ("The United States generally has standing to sue when it alleges an 'injury to its sovereignty arising from violation of its laws[.]'" (quoting *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)) (collecting cases).

Illinois is actively "impair[ing]" the United States's "legally protected interest in enforcing federal law" by threatening CFTC-regulated DCMs with criminal and civil penalties for allowing customers to trade federally regulated swaps. But Congress subjected these transactions to the Commission's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). And more broadly, Congress empowered the Commission to administer the CEA's "comprehensive regulatory structure" for derivatives transactions. *Curran*, 456 U.S. at 356. If states can criminally prosecute exchanges for hosting CFTC-approved transactions, the blow to the Commission's sovereign interest as the exclusive regulator of event contracts on DCMs would be substantial. *See KalshiEX LLC v. Johnson*, __ F. Supp. 3d __, 2026 WL 1223373, at *3 (D. Ariz. May 5, 2026) ("The CFTC therefore has standing to seek to enjoin Arizona's enforcement of its gambling laws against event contracts traded on DCMs.").

The Commission has already experienced injuries associated with States' attempts to ban event contracts. DCMs have sought guidance from the Commission's staff as to appropriate steps to take under the CEA and Commission regulations if ordered to cease operations in particular States. The Commission has devoted resources to determining the necessary compliance requirements, which have diverted Commission resources away from its core function of

13

supervising DCMs and other markets. *See* Ex. A, Declaration of Joshua Beale ¶ 7. Illinois's actions only amplify these diversions.

A "threatened injury" satisfies the "actual or imminent" requirement if it is "certainly impending, or there is a substantial risk that the harm will occur." *Department of Commerce v. New York*, 588 U.S. 752, 766–67 (2019). That is the case here: Illinois has threatened CFTC-regulated DCMs with criminal prosecution and civil penalties because they offer certain CFTC-regulated event contracts. Those DCMs plan on continuing to offer those contracts absent the law. Meanwhile, the Sports Wagering Act's new exchange wager fee is incontrovertible evidence of Illinois's intent to effectively ban DCMs from operating in the State. Depending on how these fees are calculated, they likely equal or exceed the per-transaction fees the DCMs charge traders, effectively operating as an outright ban. *See, e.g.,* Kalshi Fee Schedule, Kalshi.com/docs/kalshi-fee-schedule.pdf. In those circumstances, DCMs would face a Hobson's choice: drastically increase user fees or cease operations in Illinois entirely.

Illinois's threats hang over CFTC-regulated markets, chilling DCMs' operations and confounding the Commission's regulation of a market over which Congress gave it "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A); *see United States v. Texas*, 97 F.4th 268, 278 (5th Cir. 2024) (rejecting argument "that the United States lacks a cognizable path for seeking to enjoin an allegedly preempted state law," particularly where "the United States has asserted that the laws at issue may disrupt or interfere with its core constitutional authority"). This intrusion into and disruption of the Commission's regulatory authority is a classic injury in fact that satisfies Article III's requirements.

14

**II.     Plaintiffs are likely to succeed in establishing that federal law preempts Illinois law as applied to commodity derivatives transactions**

Illinois has no authority to regulate—much less criminalize or single out with retaliatory fees—event contracts listed on CFTC-regulated markets for two reasons. First, event contracts qualify as "swaps" under the CEA. Second, Congress gave the Commission "exclusive jurisdiction" to regulate transactions involving swaps, thereby preempting state regulation. Plaintiffs are thus likely to succeed on the merits of their preemption claim, which warrants a preliminary injunction.

**A.     Event contracts are "swaps" under the CEA**

Congress "defined 'swap' broadly." *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). The term encompasses "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A), (A)(ii). Event contracts—including those Illinois described in its cease-and-desist letters as unlawful "sports wagering activity"— straightforwardly qualify as "swaps" under this definition.[10] *See Flaherty*, 172 F.4th at 227–28 (holding that "Kalshi's sports-related event contracts" are "'swaps' subject to the CFTC's jurisdiction"); *id.* at 233 (Roth, J., dissenting) ("A plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition" of swaps.).

---

[10] The United States Senate agrees. On April 30, 2026, the Senate changed its rules to add a provision barring members from participating in "prediction market[s]" and describing those transactions as "swap[s] … as defined in section 1a of the Commodity Exchange Act … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of a specific event or contingency." S. Res. 708, 119th Cong. (2026).

**1.** For starters, event contracts make "payment . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." 7 U.S.C. § 1a(47)(A)(ii). Consider an event contract in which a participant takes a "yes" position on a Democrat winning the Illinois gubernatorial race in 2026. "[P]ayment" under that contract is plainly "dependent on the occurrence . . . of an event"—namely, a Democrat winning the race for governor. Likewise, a "yes" position on a Democrat winning more than 55% of the vote is "dependent on . . . the extent of the occurrence of an event"—the extent to which the Democrat wins the race for governor. *See Johnson*, 2026 WL 1223373, at *4 (explaining that the phrase "*extent of* the occurrence of an event or contingency" "reaches how an event unfolds, not just whether it happens").

**2.** Additionally, to be a swap, the "event" on which the payoff is dependent must be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The event contracts targeted by Illinois easily clear the bar. Citing 720 ILCS 5/28-1(a)(12), the state's cease-and-desist letters proclaim that it is "unlawful to knowingly establish, maintain, or operate an Internet site . . . that permits a person to make a wager upon the result of any sport, game, contest, political nomination, appointment, or election" without a Board-issued license. Elections undeniably have all kinds of financial, economic, and commercial consequences. And the outcome of a sporting event has "potential" to affect "numerous . . . stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities." *Flaherty*, 172 F.4th at 227–28. Those "financial consequences" may not be felt "right away"—indeed, they may never *actually* occur—but "Congress chose to use [the qualifier] 'potential,' which is broad." *Orgel*, 2026 WL 474869, at *8; *see Alabama Power Co. v. Costle*,

16

636 F.2d 323, 353 (D.C. Cir. 1979) (recognizing that "potential . . . will always and inherently exceed actual").

**3.** The CEA's "Special Rule" further underscores that event contracts are swaps within the Commission's jurisdiction. The Special Rule provides that "[i]n connection with the listing of agreements, contracts, transactions, or *swaps* in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency . . . by a designated contract market or swap execution facility, the Commission may determine that such [contracts] are contrary to the public interest if [they] involve" various enumerated activities, including "terrorism," "assassination," "war," and "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added). And if the Commission determines an event contract is contrary to the public interest, it cannot be listed. *Id.* § 7a-2(c)(5)(C)(ii). The Special Rule thus confirms (1) the Commission's jurisdiction over event contracts involving the enumerated activities, and (2) that the definition of "swap" encompasses event contracts.

**4.** Congress's enactment of the Special Rule was not the first time it recognized that the CFTC has exclusive authority to regulate swaps on DCMs even if some might mistake DCM-listed swaps as bets or wagers. The Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA) prohibits an online "bet or wager" that is "unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10)(A). And the UIGEA's definition of "bet or wager" includes "staking or risking . . . something of value upon . . . a contest of others, a sporting event, or . . . the event of a certain outcome." *Id.* § 5362(1)(A). Yet Congress expressly excluded from the definition of "bet or wager" "any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the Commodity Exchange Act." *Id.* § 5362(1)(E)(ii). Recognizing that some

17

could mistake CEA-regulated swaps as bets or wagers, Congress resolved the question conclusively by removing CEA-regulated swaps from the UIGEA's ambit.

### B. The CEA preempts state law

Under the Constitution's Supremacy Clause, "federal law preempts contrary state law." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 162 (2016). Most straightforwardly, Congress can "express[ly]" withdraw specified powers from the states. *Arizona v. United States*, 567 U.S. 387, 399 (2012). In addition, "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by . . . exclusive [federal] governance." *Id.* "[S]tate laws are [also] preempted when they conflict with federal law." *Id.* Whether on express, field, or conflict preemption grounds, federal law preempts Illinois state law as applied to CFTC-regulated DCMs.

### 1. The CEA expressly preempts state regulation of commodity derivatives transactions

The CEA confers on the Commission "exclusive jurisdiction" to regulate "accounts, agreements, . . . and transactions involving swaps." 7 U.S.C. § 2(a)(1)(A). That is plainly an expression of preemptive intent. *See Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) ("[T]he plain wording of the clause . . . contains the best evidence of Congress' preemptive intent."). If the Commission has "exclusive jurisdiction . . . with respect to" event contracts, other governmental authorities—including the states—necessarily lack "jurisdiction" over event contracts. 7 U.S.C. § 2(a)(1)(A); *see Curran*, 622 F.2d at 232 ("[T]he thrust of the [exclusive-jurisdiction] provision was to ensure that regulatory bodies other than the CFTC would not interfere with the orderly development and enforcement of commodities regulation.").

The balance of § 2(a)(1)(A) reinforces that default rule. It states that "[*e*]*xcept as hereinabove provided,*" Congress did not "supersede or limit the jurisdiction at any time conferred

18

on . . . regulatory authorities under the laws of . . . any State" or "restrict" State authorities "from carrying out their duties and responsibilities." 7 U.S.C. § 2(a)(1)(A) (emphasis added). The CEA thus contemplates States retaining regulatory jurisdiction "[e]xcept" with respect to "accounts, agreements . . . and transactions involving swaps." *Id.*; *see Johnson*, 2026 WL 1223373, at *6 (holding that this "savings clause underscores the [CEA's] preemptive effect"). Accordingly, "courts have held that [§] 2(a)(1) of the CEA preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980); *see Christensen Hatch Farms, Inc. v. Peavey Co.*, 505 F. Supp. 903, 910 (D. Minn. 1981) (same). Such a savings clause would not be necessary if it were otherwise. *See Effex Capital, LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) ("to give 'full effect' to both the savings clause and the jurisdictional clause," "preemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market'").

Other provisions of the CEA underscore the primacy of federal law. Section 13a-2(1), for instance, empowers a State to file suit to enjoin violations of the CEA or a Commission regulation. 7 U.S.C. § 13a-2(1). The natural implication is that states generally lack authority to apply their *own* laws to CFTC-regulated transactions.[11] And even when purporting to enforce the CEA, states cannot sue "a contract market," 7 U.S.C. § 13a-2(1), doubling the inference that States cannot criminalize the operation of a CFTC-registered prediction market.

Likewise, Section 16(e)(1) insulates various laws and actions from preemption, including state laws applicable to certain *off-DCM* transactions or *unregistered* persons. 7 U.S.C. § 16(e)(1)(B)–(C). Yet Congress omitted any potential for state law to apply to *on-DCM*

---

[11] States may sue in state court for "an alleged violation of any general civil or criminal antifraud statute of such State." 7 U.S.C. § 13a-2(7). Again, the implication is that States cannot sue for alleged violations of *other* state laws, such as laws that target a class of derivatives.

19

transactions or *registered* persons, *id.*, further reinforcing that state law has no application to swap transactions and DCMs.

Some courts, to be sure, have pointed to *other* preemption provisions—namely, § 16(e)(2) and § 16(h)—and concluded that because these do not expressly preempt state gambling laws applicable to swaps, such laws remain enforceable. *E.g.*, *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 681 (D. Md. 2025). Neither § 16(e)(2) nor § 16(h), however, detracts from the preemptive force of § 2(a)(1).

Take § 16(e)(2) first. That language was added to clarify that even where a contract is "excluded" or "exempted" by the Commission, the CEA nonetheless "supersede[s] and preempt[s] the application of any State or local law that prohibits or regulates gaming" as to those contracts. 7 U.S.C. § 16(e)(2); *see Thrifty Oil Co. v. Bank of Am. National Tr. & Sav. Ass'n*, 322 F.3d 1039, 1057 (9th Cir. 2003) ("In other words, where the CFTC exempts transactions from the CEA pursuant to Section 4(c), those same transactions benefit from preemption of state bucket shop laws under Section 12(e)(2)(A)."). If state law is preempted as to *excluded* or *exempted* transactions, it follows that state law is preempted as to *non-excluded* and *non-exempted* transactions on an exchange—which, after all, come within the Commission's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A).

Section 16(h) provides that a swap "shall not be considered to be insurance" and accordingly "may not be regulated as an insurance contract under the law of any State." 7 U.S.C. § 16(h). The preemption of state insurance law in no way implies the non-preemption of other state laws. Section 16(h) was enacted in the aftermath of the 2008 financial crisis, which many in Congress attributed to credit default swaps—"an arrangement similar to an insurance contract." *Merrill Lynch Int'l v. XL Cap. Assur. Inc.*, 564 F. Supp. 2d 298, 300 (S.D.N.Y. 2008). Under the

20

circumstances, Congress's use of a "belt-and-suspenders approach to make sure that *all*" swaps were governed by federal law is a perfectly "likely" inference, *see Atlantic Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020), far more "likely" than the notion that Congress only preempted state insurance law as to swaps but implicitly left other state law intact (all whilst giving the Commission "exclusive jurisdiction" over swaps).

### 2. The CEA occupies the field of regulating trading on a DCM

"Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation,'" *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018), or where "there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," *Arizona*, 567 U.S. at 399. "[L]ike all [forms of] preemption," field preemption "must be grounded 'in the text and structure of the statute at issue.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020).

As the Third Circuit held, the CEA preempts the field of "regulation of trading on a DCM (a form of futures trading)," making state prohibitions on event contracts unlawful. *Flaherty*, 172 F.4th at 229. Congress gave the Commission "exclusive jurisdiction" over "swaps . . . traded or executed on a [DCM]," and it allowed state "regulatory authorities" to retain jurisdiction only "[e]xcept as hereinabove provided." 7 U.S.C. § 2(a)(1)(A). DCMs, moreover, are subject to extensive regulation by the Commission. They must, among other things, register with the Commission, *id.* § 7(a); comply with "core principle[s]" governing trading, *id.* § 7(d); and self-certify compliance with the CEA and the Commission's regulations, *id.* § 7a-2(c)(1). "These provisions regulate every aspect of DCMs, . . . leaving no room for state regulation." *Johnson*, 2026 WL 1223373, at *6; *see also Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001) ("Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities"

21

and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions.").

Congress understood this when it created the CFTC and the "comprehensive regulatory structure" it charged the Commission with administering. *Curran*, 456 U.S. at 356. As the Conference Report details, the "exclusive grant of jurisdiction" to the Commission was designed to "preempt the field insofar as futures regulation is concerned," such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383, at 35–36 (1974). Congress also deleted from the CEA language that allowed the States to retain a measure of regulatory authority, which "assure[d] that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974); *see Effex Capital*, 933 F.3d at 894 ("[A] catalyst for the significant [1974] amendments to the Commodity Exchange Act was a fear that, without increased federal regulation, the states would regulate the futures markets to a chaotic effect.").

The enactment of the Special Rule in 2010 further consolidated the Commission's control over the field of event contracts. *See* 7 U.S.C. § 7a-2(c)(5)(C). That Rule, again, grants the Commission discretionary authority to approve or disapprove of event contracts that involve certain enumerated categories of activity. *Id.* § 7a-2(c)(5)(C)(i)–(ii); 17 C.F.R. § 40.11(c)(2). By creating a specific public-interest review process, Congress clearly signaled that these contracts are within the Commission's exclusive regulatory purview, not the states'. Illinois is targeting event contracts that involve precisely these activities—yet another indication that the law directly invades the Commission's exclusive domain.

22

"[A]t the very least," then, Congress has field preempted "the regulation of trading on a DCM," which encompasses "event contracts" traded on prediction markets. *Flaherty*, 172 F.4th at 228–29.

### 3. Illinois's application of its laws to commodities derivatives contracts conflicts with the CEA and Commission rules

Finally, "conflict preemption . . . prohibits [a State] from regulating sports-related event contracts on CFTC-licensed DCMs." *Flaherty*, 172 F.4th at 229. Conflict preemption comes in two varieties: when "compliance with both state and federal law is impossible" or when "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pharmacy Rsch. & Manufacturers of Am. v. McClain*, 95 F.4th 1136, 1140 (8th Cir. 2024). Both apply here.

**1.** If DCM-hosted swaps are subject to state gambling law, including special transaction fees that only apply to federally regulated markets, then compliance with both state and federal law is impossible. A DCM is required by federal law to provide "impartial access to its markets and services" to all its "members," and to provide "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b). If Illinois is allowed to single out DCMs, however, then those DCMs will be forced to discriminate against Illinoisans by either passing on some of the costs or by delisting event contracts there entirely. That would violate the requirement of "impartial" and "non-discriminatory" access. *See Johnson*, 2026 WL 1223373, at *8 (holding that if event contracts are prohibited under Arizona law, "a DCM operator must exclude Arizona residents from trading event contracts on its platform, in violation of 17 C.F.R. § 38.151(b) and (b)(1)").

**2.** If nothing else, subjecting CFTC-regulated markets to state-by-state requirements would stand as an impermissible obstacle to federal regulation. "As Congress recognized in enacting the

23

[CFTC] Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *American Agric. Movement, Inc. v. Board of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992); *see Johnson*, 2026 WL 1223373, at *8 ("If states could prosecute DCM operators for offering event contracts, the operators would face the prospect of fifty different regulators, each capable of restricting which contracts may be listed on each exchange."). Thus, allowing states to regulate derivatives like event contracts could reintroduce the "total chaos" Congress sought to prevent by providing the Commission with exclusive jurisdiction over futures trading in 1974.[12] It would also invite the type of "interference with the discretion that federal law delegates to federal officials [that] goes to the heart of obstacle preemption." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 762 (9th Cir. 2022) (en banc).[13]

## III.     The remaining factors favor granting preliminary relief

Absent an injunction, the federal government will suffer irreparable harm. It is well established that "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978). Supremacy Clause violations are no exception. *See United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026) ("[I]rreparable harm necessarily results from allowing California to enforce a law invalid under the [Supremacy Clause]."); *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010) ("If a statute is expressly preempted, a finding with regard to likelihood

---

[12] *See* Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

[13] Illinois's intrusion into the CFTC's jurisdiction also violates the Supremacy Clause because it violates intergovernmental immunity. "Just as [Illinois] cannot regulate the federal government itself, [it] cannot regulate private parties in a way that severely undercuts a federal function." *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 322 (3d Cir. 2025).

24

of success fulfills the remaining [preliminary injunction] requirements."). After all, the United States is injured "when its valid laws in a domain of federal authority are undermined by impermissible state regulations," *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see supra* 12–14, and because that injury cannot be undone by an eventual award of damages, it is necessarily irreparable. *See Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024) (irreparable harm occurs where "there is a clear and present need for equitable relief").

The Commission's "exclusive jurisdiction" over derivatives markets is meaningless if States can effectively banish contract markets they disfavor. 7 U.S.C. § 2(a)(1)(A). Illinois's special transaction fee on federally regulated exchanges and threats to criminally prosecute DCMs hamper the Commission's ability to foster an efficient, orderly national derivatives market.[14] If Illinois's campaign against prediction markets succeeds, it will result in exactly the type of patchwork regulation and market distortions that the CEA was enacted to prevent. *See Flaherty*, F.4th at 230 ("[Such] state regulation is exactly the patchwork that Congress replaced wholecloth by creating the CFTC.") Absent an injunction, DCMs will be unable to offer a host of federally regulated swaps in Illinois, even though the CFTC's authority to authorize those contracts falls within its exclusive jurisdiction. There is no remedy at law for such an injury. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are imminent . . . there is no adequate remedy at law.").

---

[14] As part of the related litigation with Coinbase, the State agreed to "refrain from taking enforcement action against Plaintiff or any of its affiliates or employees during the pendency of Plaintiff's motion for preliminary injunction before this Court." *Coinbase Financial Markets, Inc. v. Kwame Raoul, et al.*, Case No.: 1:25–cv–15406, Dkt. 30 at 2 (Dec. 29, 2025). But, contrary to Illinois's bare assertions in its filings in this case, see Dkt. No. 29 at 2; Dkt. No. 25 at 4, Illinois's agreement not to pursue enforcement against particular CFTC-regulated entities does not foreclose that it will not pursue others, thereby continuing the harm to the federal government stemming from the State's looming enforcement. And it is unclear if Illinois's agreement extends to the recent legislative change instituting the transaction fee.

25

The public interest and equities prongs merge when the United States is a party because "[f]rustration of federal statutes and prerogatives are not in the public interest." *Alabama*, 691 F.3d at 1301. And where a state law is preempted, the State is not "harm[ed] from . . . nonenforcement of invalid legislation." *Id.* Accordingly, as the Third Circuit held, it is neither equitable nor in the public interest to allow States to discriminate against prediction markets in violation of the Supremacy Clause. *See Flaherty*, 172 F.4th at 232; *see also Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 643 (6th Cir. 2025) ("enjoining the enforcement of a [state gambling] law that violates constitutional rights 'is always in the public interest'"); *Orgel*, 2026 WL 474869, at \*10 ("A credible threat of imminent prosecution for a state violation that conflicts with federal law can establish a likelihood of irreparable harm.").

On the other hand, the "remedy" of "a continuing constitutional violation . . . certainly would serve the public interest." *Preston*, 589 F.2d at 303 n.3. The public interest in an injunction is heightened here, given the sweeping criminal liability that Illinois has threatened to impose. In Illinois's view, its gambling laws extend beyond DCMs to CFTC-regulated Futures Commission Merchants (like Robinhood) that act as intermediaries between consumers and DCMs. Next, Illinois could target customers of prediction markets who are operating under the presumption that their behavior is lawful and subject to federal regulation.[15]

Finally, were the Court to hold that event contracts are not swaps (*but see supra* 14–17), that could deprive the Commission of *any* jurisdiction over event contracts, thereby creating a further regulatory uncertainty nationwide, undermining the Commission's jurisdiction over event contracts in general. The Commission's jurisdiction to bring enforcement actions for insider

---

[15] 720 ILCS 5/28-1(b)(15) exempts from criminal liability "[s]ports wagering when conducted in accordance with the Sports Wagering Act," but Illinois's position that the relevant event contracts are unlicensed sports wagering necessarily subjects the individual users on either end of those contracts to criminal liability.

trading on prediction markets, for example, has been premised on event contracts qualifying as swaps. *See Van Dyke*, Dkt. 1 ¶¶ 61, 72, 81; *Spagnuolo*, Dkt. 1 ¶¶ 27, 29, 50. If that premise is rejected, as Illinois would have this Court do, the Commission's jurisdiction would become more tenuous.

The Court should not tolerate this massive short-circuiting of the Commission's jurisdiction. Congress created "a comprehensive regulatory structure" over "futures trading," *Curran*, 456 U.S. at 356, and it vested jurisdiction over swaps—including event contracts— exclusively with the Commission. Illinois's incursions into the Commission's domain are unlawful. At minimum, the Court should preserve the status quo by entering a preliminary injunction, which would protect the federal government from irreparable harm and preserve market stability while the Court considers the merits.

## CONCLUSION

The United States and the Commission respectfully ask this Court to enter a preliminary injunction prohibiting Defendants from enforcing Illinois's gambling laws, including but not limited to the Illinois Gambling Act, 230 ILCS 10/1 *et seq.*, the Illinois Sports Wagering Act, 230 ILCS 45/25-1 *et seq.*, the Illinois Criminal Code, 720 ILCS 5/28-1(a), and the Illinois Administrative Code, 11 Ill. Admin. Code 1900.1210(a), through any criminal or civil enforcement actions related to event contracts listed on CFTC-regulated DCMs, including by engaging in any subpoena process or other compulsory investigative process related to event contracts listed on CFTC-regulated DCMs.

Dated: June 17, 2026

Respectfully submitted,

By: */s/ David W. Rubin*
David W. Rubin
(*pro hac vice*)
Senior Assistant General Counsel
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581
Tel. (202) 418-5734
drubin@cftc.gov

*Attorneys for the United States of America*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIBERIUS DAVIS
Counsel to the Assistant Attorney General
450 5th St. NW
Washington, DC 20001
tiberius.davis@usdoj.gov
Tel. 202-860-8970

ALEXANDRA McTAGUE SCHULTE
Senior Litigation Counsel
alexandra.schulte@usdoj.gov
Tel. 202-718-0483

*Attorneys for the Commodity Futures Trading Commission*

TYLER S. BADGLEY
  General Counsel
M. JORDAN MINOT
  Deputy General Counsel
  (*pro hac vice*)
DAVID W. RUBIN
  Senior Assistant General Counsel
  (*pro hac vice*)
CARLIN METZGER
  Senior Assistant General Counsel
  (Ill. ARDC No. 6275516)
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel. 202-209-1087
Fax. 202-418-5567
tbadgley@cftc.gov
jminot@cftc.gov
drubin@cftc.gov
cmetzger@cftc.gov

28